# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TIFFANY WILLIAMS, *et al.*,     )
                                     )

          Plaintiffs,          )

                                     )

          v.                  )      Civil Action No. 18-1353

                                     )

BOB EVANS RESTAURANTS, LLC, *et al.*,   )

                                     )

          Defendants.        )

                                     )

## <u>MEMORANDUM OPINION</u>

The Plaintiffs in this proposed class and collective consolidated action are "tipped employees" who work or worked as servers at Bob-Evans-branded restaurants and who allege several claims pursuant to the Fair Labor Standards Act ("FLSA") and various state wage payment laws. Presently before the Court are Plaintiffs' renewed Motion for Conditional Certification, Approval of Proposed Notice Procedure, and Equitable Tolling ("Motion for Conditional Certification") (ECF Nos. 141, 169) and Motion for Equitable Tolling (ECF No. 185). Plaintiffs seek conditional certification of these FLSA claims to send opt-in notices to approximately 40,000 servers who work or worked at one or more of Bob Evans' 480 restaurants located in 18 states from October 10, 2015, to present.[1] Plaintiffs' Motions are granted in part and denied in part for the reasons that follow.

---

[1] Plaintiffs' Motion for Conditional Certification does not specify their target collective with temporal particularity, but Plaintiffs do appear to seek conditional certification for all servers company-wide from October 10, 2015, to present. (*See* ECF Nos. 141-19; 151 at 6). Bob Evans disagrees and instead asserts that "the relevant time for potential certification does not go back to 2015" yet it does not propose a different time frame. (*See* ECF No. 170 at 12, n. 8). Instead, Bob Evans' proffers a declaration from its Chief Operating Officer, Michele Mills, who surmises that Plaintiffs' proposed collective action encompasses the period from February 1, 2016 through January 13, 2020. (*See* ECF No. 145-1, ¶ 16). Ms. Mills' basis for these dates is unclear to the Court.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs Tiffany Williams and Doreen Walker filed their initial collective action complaint (the "Williams lawsuit" (ECF No. 1)) on October 10, 2018, and they subsequently filed their first amended complaint on December 7, 2018.  (ECF No. 10).  On December 14, 2018, 299 additional individuals opted into the Williams lawsuit. (ECF No. 11).   Shortly thereafter, on February 1, 2019, Plaintiffs Williams and Walker filed their initial Motion for Conditional Certification and Approval of Proposed Notice and Opt-In Procedure and supporting brief. (ECF Nos. 31 and 32). On June 14, 2019, they filed their initial Motion for Equitable Tolling and supporting brief. (ECF Nos. 87 and 88).

Separately, on January 24, 2019, Plaintiff April McKeel filed a complaint in the Western District of Pennsylvania at Case No. 2:19-cv-00082 (the "McKeel lawsuit"), and the Court consolidated it with the Williams lawsuit on April 2, 2019.  (ECF No. 49).  Thereafter, on July 29, 2019, Plaintiff Regina Jensen and others filed yet another separate action in the Southern District of Ohio at Case No. 19-cv-00921 (the "Jensen lawsuit").   The Court held a telephonic status conference and thereafter stayed the Williams and McKeel lawsuits (ECF No. 120) until November 19, 2019, when the Court entered an Order Consolidating Cases, Approving Stipulation, Resolving Certain Motions, and Setting Deadlines. (ECF No. 129).  On multiple occasions along the way, an additional 45 individuals opted into the Williams, McKeel, and Jensen lawsuits. (ECF Nos. 58, 59, 67, 82, 87, 91, 114, 121).

After these three lawsuits were consolidated, Plaintiffs[2] filed their operative Second Amended Consolidated Master Complaint (the "Complaint") (ECF No. 130) on November 20,

---

[2]      The named Plaintiffs are Tiffany Williams, Doreen Walker, April McKeel, Michaela Caperna, Lois Williams, Inez Ratcliff, Samantha Hutton, Nicole Leo, Joanne Peabody, Christina Turner, Brittany Willis, Regina Jensen, Vickie Rash, Rebecca Bailey, and James Woodworth.

2019, alleging twenty (20) causes of action for minimum wage, tip credit notification, and overtime violations of the FLSA and various state laws.  The Defendants filed Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (ECF Nos. 138, 139), and Plaintiffs filed a renewed Motion for Conditional Certification, Approval of Proposed Notice Procedure and Equitable Tolling. (ECF No. 141).  The Court partially granted Defendants' Motions to Dismiss in an Opinion and Order each dated August 13, 2020 (ECF Nos. 155 and 156), thereby dismissing all claims asserted against Defendant Bob Evans Farms, Inc. ("BEF Inc."),[3] and dismissing those claims asserted against Defendants Bob Evans Farms LLC ("BEF LLC") and Bob Evans Restaurants LLC ("BER") that alleged violations of Illinois, Ohio, and West Virginia law.[4]  The Court also denied Plaintiffs' Motion for Conditional Certification, Approval of Proposed Notice Procedure and Equitable Tolling without prejudice as premature.  (ECF No. 156).

Plaintiffs' surviving claims against BEF LLC and BER[5] (referred to collectively herein as "Bob Evans") consist of minimum wage, tip credit notification, and overtime violations under the FLSA, along with claims under various state wage payment and collection laws.  These surviving FLSA claims include: (i) minimum wage violations for failing to notify Plaintiffs of the tip credit and failing to make up the difference between their tip-credit wages and minimum wage (Count I); (ii) minimum wage violations for unpaid wages for non-tipped duties that were *unrelated* to the Plaintiffs' tipped occupation (Count II); (iii) minimum wage violations for allegedly requiring the Plaintiffs to spend more than 20% of their work-week performing non-tipped duties that were

---

[3]      Defendant BEF Inc. sought dismissal of all claims asserted against it.  (ECF No. 138).

[4]      Defendant BER filed a partial motion seeking dismissal of Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XII (partially), XIV, XV, and XVI.  (ECF No. 139).  The Court dismissed Counts V, VI, X, XV, and XVI.

[5]      BEF LLC operated the Bob Evans-branded restaurants until April 28, 2017, when it sold them to BER.  (ECF No. 138).

*related* to their tipped occupation such as setting and bussing tables, brewing coffee, and rolling silverware (Count III); and (iv) overtime violations (Count IV).

On October 16, 2020, and in accordance with the Court's scheduling orders, Plaintiffs renewed their Motion for Conditional Certification, Approval of Proposed Notice Procedure and Equitable Tolling (ECF Nos. 141, 169 and 169-1), and the parties filed supplemental briefing, along with multiple Notices of Supplemental Authority. (ECF Nos. 170, 172, 173, 174, 175, 178, 184, 189).

Finally, on November 8, 2021, Plaintiffs filed another Motion for Equitable Tolling and the parties submitted supporting and opposing briefs. (ECF Nos. 185, 186, 188, 190).

The parties have had ample opportunity to submit evidence and briefs in support of and opposition to these pending motions, which are now ripe for disposition.

## II.   <u>DISCUSSION</u>

Plaintiffs ask the Court to conditionally certify their proposed collective action on behalf of themselves and "similarly situated" employees pursuant to 29 U.S.C. § 216(b):

> An action to recover the liability . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Id*.

An FLSA collective action "is a form of group litigation in which a named employee plaintiff or plaintiffs file a complaint 'in behalf of' a group of other, initially unnamed employees who purport to be 'similarly situated' to the named plaintiff." *Halle v. West Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 223 (3d Cir. 2016).  By permitting employees to proceed collectively, the FLSA "provides employees the advantages of pooling resources and lowering individual costs so

4

that those with relatively small claims may pursue relief where individual litigation might otherwise be cost-prohibitive.  It also yields efficiencies for the judicial system through resolution in one proceeding of common issues arising from the same allegedly wrongful activity affecting numerous individuals." *Id.*

The Third Circuit Court of Appeals has taken a practical approach to managing FLSA collective actions by adopting a "widely accepted" two-step process for deciding whether an action brought under 29 U.S.C. § 216(b) may proceed collectively. *Halle*, 842 F.3d at 224; *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013).  The first step is known as the "conditional certification" or "notice" stage where "the court makes a preliminary determination as to whether the named plaintiffs have made a modest factual showing that the employee[s] identified in their complaint are 'similarly situated.'" *Camesi*, 729 F. 3d at 243. In other words, the named plaintiffs are required to make a "modest factual showing" – something beyond mere speculation – to demonstrate a factual nexus between the manner in which the employer's alleged policy affected them and the manner in which it affected the proposed collective action members. *Halle*, 842 F.3d at 224 (citing *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 n. 4 (3d Cir. 2012)).

The "sole consequence" of conditional certification is the dissemination of court-approved notice to potential collective action members.  *Halle*, 842 F.3d at 224 (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)).  Conditional certification, therefore, is not a true certification, but rather an exercise of a district court's discretionary authority to oversee and facilitate the notice process.  *Halle*, 842 F.3d at 224; *Zavala*, 691 F.3d at 536.  It is "neither necessary nor sufficient for the existence of a representative action under [the] FLSA." *Zavala*, 691 F.3d at 536 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 n. 10 (2d Cir. 2010)).  Indeed,

"[a] denial at the conditional certification stage is not necessarily a final determination of whether the matter may proceed as a collective action.  Some courts permit the issue to be revisited after discovery or efforts by the named plaintiff to re-define the contours of the proposed collective action."  *Halle*, 842 F.3d at 224-25 (citations omitted).

Once conditional certification has been granted, individuals seeking to join the collective action typically file notices providing their written consent to participate.  *Halle*, 842 F.3d at 225. Although these notices may indicate consent to having the named plaintiffs litigate the FLSA claims on their behalf, every plaintiff who opts-in to a collective action has party status. *Id.*  This stage is also when the parties conduct certification-related discovery to assess whether the opt-ins are "similarly situated" to the named plaintiffs, frequently focusing on the named plaintiffs and a subset of the conditional collective group. *Id.*; *see also Lusardi v. Xerox Corp.*, 975 F.2d 964, 967 (3d Cir. 1992) (the parties in ADEA collective action randomly selected 51 out of 1,312 conditional collective action members for discovery to determine whether all opt-ins were similarly situated).

Then, the case proceeds to the second step where the parties file motions seeking final certification or decertification.  At this "more stringent" stage, the named plaintiffs bear the burden of showing by a preponderance of the evidence that the members of the collective are "similarly situated."[6]  *Halle*, 842 F.3d at 226, *Zavala*, 691 F.3d at 534.  To be "similarly situated" means that "one is subjected to some common employer practice that, if proved, would help demonstrate a

---

[6]     Courts consider a variety of relevant factors at this final certification stage, including the factual and employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may be subject to on an individual basis, and the degree of fairness and procedural impact of certifying the action as a collective action. *Halle*, 842 F.3d at 226. The Third Circuit endorses an *ad hoc* approach to analyzing these relevant factors and determining on a case-by-case basis whether the named plaintiffs have satisfied their burden by a preponderance of the evidence. *Id.* (citing *Zavala*, 691 F.3d at 536-37).

violation of the FLSA." *Halle*, 842 F.3d at 226 (citing *Zavala*, 691 F.3d at 538). While the initial stage of conditional certification asks whether similarly situated plaintiffs do, in fact, exist, the second stage asks whether the specific plaintiffs who have opted-in are, in fact, similarly situated to the named plaintiffs. *Zavala*, 691 F.3d at 536 n. 4; *Meals v. Keane Frac GP LLC*, Civ. No. 16-1674, 2017 WL 2445199, at *3 (W.D. Pa. June 6, 2017).

Ultimately, the collective action proceeds to trial on a representative basis if certification is granted; but, if the action is decertified, then the named plaintiffs would be permitted to proceed to trial while the opt-in plaintiffs would be dismissed from the case without prejudice. *Halle*, 842 F.3d at 226 (citing *Lusardi v. Lechner*, 855 F.2d 1062, 1079 (3d Cir. 1988)).

Here, at this conditional certification stage of these proceedings, the Court must make a preliminary finding as to whether the other employees described in Plaintiffs' Motion for Conditional Certification can be provisionally categorized as "similarly situated" to Plaintiffs. To do so, Plaintiffs must produce some evidence, "beyond pure speculation," of a factual nexus between the way Bob Evans' alleged unlawful policies or practices affected them and the way those policies and practices affected those to whom opt-in notice would be sent if conditionally certified. *Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011), *rev'd on other grounds*, 569 U.S. 66 (2013); *Zavala*, 691 F.3d at 536. Plaintiffs can satisfy this standard by "producing some evidence indicating common facts among the parties' claims, and/or a common policy affecting all the collective members." *Meals*, 2017 WL 2445199, at *3. Stated differently, Plaintiffs must show three things: (i) an employer policy, (ii) that affected the Plaintiffs in a particular way, and (iii) that also affected other employees in a similar way. *Dunkel v. Warrior Energy Servs., Inc.*, 304 F.R.D. 193, 200 (W.D. Pa. 2014).

In support of their motion, Plaintiffs rely on the declarations of seven named Plaintiffs and three opt-in Plaintiffs who aver that Bob Evans' servers were subject to common policies and practices at all restaurant locations.  (*See* ECF Nos. 141-1; 141-2; 141-3; 141-4; 141-5; 141-6; 141-12; 141-13; 141-14; 141-15; 141-16; 141-17).  According to these declarations and other proffered documents, Bob Evans invites prospective employees to apply on-line for open positions at all its restaurants, including for server positions, (*see* ECF No. 141, ¶ 4 (citing https://careers.bobevans.com/ (last visited Jan. 26, 2019)), and requires its servers to complete a training program and receive a company-wide employee handbook upon being hired.  (*See* ECF Nos. 141-1, ¶ 6; 141-2, ¶ 5; 141-3, ¶ 5; 141-4, ¶ 6; 141-5, ¶ 5; 141-6, ¶ 5; 141-8).  Bob Evans also provides its servers with access to an online portal called BE-NET, which allows Bob Evans to supply information to each employee and allows its servers to access their pay stubs.  (*See* ECF Nos. 141-1, ¶ 6; 141-2, ¶ 5; 141-3, ¶ 5; 141-4, ¶ 7; 141-5, ¶ 5; 141-6, ¶ 5).  Bob Evens also utilizes identical job descriptions for the server position at all restaurant locations.  (*See* ECF No. 141-7).  Furthermore, Plaintiffs' declarations aver that they have worked at multiple restaurant locations and witnessed servers from other locations work at their restaurants when short-staffed and at times permanently transfer to their locations when other restaurant locations closed.  (*See* ECF Nos. 141-2, ¶ 6; 141-3, ¶ 6; 141-4, ¶ 5; 141-5, ¶ 4; 141-6, ¶ 4).   Plaintiffs also aver that the servers performed the same job duties at each location, (*see* ECF Nos. 141-2, ¶ 4; 141-3, ¶ 4; 141-4, ¶ 5; 141-5, ¶ 4; 141-6, ¶ 4), that restaurant managers regularly filled in at other restaurant locations when needed, and that managers transferred between restaurant locations and enforced the same policies as resident managers. (*See* ECF Nos. 141-5, ¶ 7; 141-6, ¶ 7).  Finally, Plaintiffs proffer evidence that Bob Evans has a "uniform corporate hierarchy," "unified branding," and deploys "company-directed training" for their servers and operates "all of their restaurants the same – right down to

the disposable salt and pepper grinders they place on the tables for customers."  (ECF No. 151 at 4-5).

Although Plaintiffs certainly produced ample evidence to establish a generalized similarity among Bob Evans' servers across restaurant locations, such evidence, standing alone, does not satisfy the "modest factual showing" that they are similarly situated with other putative members of the collective vis-à-vis the four FLSA claims asserted here.  Accordingly, it is necessary to consider those claims when deciding whether Plaintiffs and other employees are "similarly situated" for the purpose of authorizing opt-in notice.  *Dunkel*, 304 F.R.D. at 199.  However, in doing so, the Court does not weigh the evidence, resolve factual disputes, or reach the merits of Plaintiffs' claims, though it may consider evidence submitted by Bob Evans because such analysis is not performed in an evidentiary vacuum.[7]  *Reed v. Empire Auto Parts, Inc.*, Civ. No. 13-5220, 2015 WL 761894, at *3 (D.N.J. Feb. 23, 2015); *Bonds v. GMS Mine Repair & Maintenance, Inc.*, No. 2:13-cv-1217, 2014 WL 2957394, at *4 (W.D. Pa. July 1, 2014); *Holley v. Erickson Living*, Civ. No. 11-2444, 2012 WL 1835738, at *7 n. 9 (E.D. Pa. May 21, 2012).  The Court "may appropriately consider, without weighing the evidence or accepting the substance of any declarations, the totality of the record available to determine whether the plaintiff has met his or her burden."  *Gordon v. Maxim Healthcare Servs., Inc.*, Civ. No. 13-7175, 2014 WL 7008469, at *2 (E.D. Pa. Dec. 11, 2014).

---

[7]    Even so, only admissible evidence may be considered in deciding a motion for conditional certification under 29 U.S.C. § 216(b).  *See Kuznyetsov v. West Penn Allegheny Health Sys., Inc.*, Civ. No. 09-cv-379, 2009 WL 1515175, at *3-4 (W.D. Pa. June 1, 2009); *Dreyer v. Altchem Env't Servs., Inc.*, Civ. No. 06-2393, 2007 WL 7186177, at *3 (D.N.J. Sept. 25, 2007) ("Courts will not consider affidavits that are not founded on personal knowledge.").

A. **FLSA Tip Credit Notice Claim** (Count I)

An employer's obligation under the FLSA to pay its employees a minimum wage for each hour worked may be offset by tips employees receive if it informs the employees of its intention to do so and allows the employees to keep all tips received.[8]  *See* 29 U.S.C. §§ 203(m)(2)(A) and 206; 29 C.F.R. § 531.59(b),[9] *see also Reich v. Chez Robert, Inc.*, 28 F.3d 401, 403 (3d Cir. 1994). This offset is known as the "tip credit."  *Reich*, 28 F.3d at 403.

Here, Plaintiffs aver that Bob Evans paid them and the potential opt-in plaintiffs below the minimum wage without first providing tip credit notice to them. (ECF Nos. 130, ¶¶ 219-222, 262-269; 141 at 8-9).  Plaintiffs specifically allege that they "do not ever recall" receiving notice of the tip credit nor how much that tip credit would be. (ECF No. 130, ¶¶ 219-222; *see also* ECF No. 155 at 28).

It is undisputed that Bob Evans applies a tip credit against its servers' wages company-wide, (*see* ECF Nos. 151 at 4-5; 145-2, ¶ 23; 145-3, ¶¶ 21, 43), and six of the fifteen named Plaintiffs proffer declarations averring that, "to [their] knowledge, no one at Bob Evans ever informed [them] that [their] wages would be subject to a tip credit during [their] employment." (ECF Nos. 141-12, ¶ 9; 141-13, ¶ 7; 141-14, ¶ 13; 141-15, ¶ 8; 141-16, ¶ 15; 141-17, ¶ 12). Plaintiffs contend that these six declarations sufficiently establish that they are similarly situated

---

[8]     An exception may be made for the pooling of tips among employees who regularly receive tips.  *Chen v. Century Buffet & Rest.*, Civ. No. 09-1687, 2012 WL 113539, at *5 (D.N.J. Jan. 12, 2012) (citing 29 U.S.C. § 203(m)).

[9]     Such notice requires the employer to inform its tipped employees: (i) the amount of the cash wage that is to be paid to the tipped employee by the employer; (ii) the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; (iii) that all tips received by the tipped employee must be retained by the employee except for a tip pooling arrangement limited to employees who customarily and regularly receive tips; and (iv) that the tip credit shall not apply to any employee who has not been informed of these requirements. 29 C.F.R. § 531.59(b).

to a putative collective of approximately 40,000 servers who work or worked at 480 Bob Evans-branded restaurant locations nationwide.[10]  The Court disagrees.

First, the named Plaintiffs cannot establish, even among themselves, that they all were similarly affected by a common practice of being paid a subminimum wage with a tip credit without first receiving tip credit notice.  Bob Evans proffers documentary proof that ten[11] of the fifteen named Plaintiffs, including four of six declarants, actually signed tip credit notices (*i.e.*, Caperna, Willis, and Turner), (*see* ECF Nos. 145-2, ¶¶ 10-12, Att. 10-16; 145-3, ¶¶ 10-11, Att. 6-7, 9-10), and/or signed acknowledgments affirming their receipt of Bob Evans' Employee Handbook Addendum containing a tip credit notice (*i.e.*, Caperna, Turner, and Hutton).  (*See* ECF Nos. 145-2, ¶¶ 7-9, Att. 1-9 at 17, 10-16; 145-3, ¶¶ 7-9, Att. 1-5).

Second, Plaintiffs have not shown that other servers were similarly affected by Bob Evans' alleged failure to provide tip credit notice.  Even if the Court were to disregard Bob Evans' evidence that two-thirds of the named Plaintiffs did, in fact, receive tip credit notice, and instead rely solely on declarations from named Plaintiffs Caperna, Peabody, McKeel, Willis, Turner, and Hutton averring that Bob Evans did not disclose or provide the requisite tip-credit notices to *them* prior to imposing the tip credit on *their* wages, and that no one at Bob Evans ever informed *them* that *their* wages would be subject to a tip credit during their employment, (*see* ECF Nos. 141-12, ¶ 9; 141-13, ¶ 7; 141-14, ¶¶ 12-13; 141-15, ¶ 7-8; 141-16, ¶¶ 14-15; 141-17, ¶¶ 11-12), nothing in their declarations show that Bob Evans had a policy or practice of not providing tip credit notice

---

[10]      Plaintiffs never fully define the size and scope of their proposed collective action.  Rather, the number of restaurants and the approximate number of putative members of the collective are supplied by Bob Evans' Chief Operating Officer Michele Mills.  (*See* ECF No. 145-1, ¶ 5).

[11]      Signed tip credit notices are supplied for named Plaintiffs Williams (PA), Walker (PA), Caperna (OH), Bailey (OH), Willis (OH), Leo (MD), Turner (MO), Jensen (WV), Rash (WV), and Woodworth (IL).  (*See* ECF Nos. 145-2, ¶ 9, Exs. 2-9; 145-3, ¶ 11, Exs. 6-7, 9-10).

to *other* servers who were also paid subminimum wage.  Rather, at most, these declarations merely speculate that these named Plaintiffs "*believe* these policies and practices to be consistent at all Bob Evans' locations," (*see* ECF Nos. 141-12, ¶ 11; 141-13, ¶ 8; 141-14, ¶ 19; 141-15, ¶ 13; 141-16, ¶ 20; 141-17, ¶ 17), and that they "*would expect* [their] work experience to be very similar at any Bob Evans location." (*See* ECF Nos. 141-12, ¶ 8; 141-14, ¶ 17; 141-15, ¶ 12; 141-16, ¶ 19; 141-17, ¶ 16).

In contrast to Plaintiffs' scant and speculative evidentiary showing, Bob Evans proffers evidence that it maintains policies and practices of providing tip credit notice to servers through multiple means.  For example, its restaurant managers meet with new servers during the new hire orientation process to explain the tipped minimum wage and tip credit.  (*See* ECF Nos. 145-2, ¶ 11; 145-3, ¶ 10).  Moreover, in addition to the tip credit notices signed by a substantial majority of the named Plaintiffs, Bob Evans also proffers: (i) declarations and tip credit notices signed by 52 servers employed in 8 states (*see* ECF No. 145-6); (ii) declarations signed by 33 servers employed in 11 states who acknowledge being told about the tip credit notice and/or signing the tip credit notice; and (iii) signed tip credit notices from a sampling of 350 servers who worked at nine different restaurants in eight states where either a named Plaintiff or opt-in Plaintiff work or worked.[12]  (*See* ECF Nos. 145-2, ¶ 13, Att. 17; 145-3, ¶ 12, Att. 8; 145-6).  Bob Evans also proffers evidence that it posted a DOL poster in every restaurant explaining the tipped minimum wage and tip credit, and that it posted any newly updated poster to replace the prior year's poster.  (*See* ECF Nos. 145-2, ¶ 15; 145-3, ¶ 17).  Bob Evans' servers are also made aware of the tipped minimum

---

[12]      Additionally, Bob Evans prepares an updated tip credit notice which all servers in the applicable state are asked to sign whenever a state's tipped minimum wage changes.  (*See* ECF Nos. 145-2, ¶ 14; 145-3, ¶ 13; 145-6). Plaintiff Turner signed these tip credit notices in 2014 and 2016; Plaintiff Jensen signed these tip credit notices in 2013, 2014, and 2015; and Plaintiff Rash signed these tip credit notices in 2011, 2012, 2014, 2015.  (*See* ECF No. 145-2, ¶ 12, Att. 13, 14, 15).

wage and tips from their weekly pay stubs.  (*See* ECF No. 145-5, ¶ 10, Att. 3).   Finally, Bob Evans proffers evidence that its payroll system automatically provides a minimum wage adjustment in any workweek in which an employee's tipped wages plus tips are not sufficient to meet minimum wage requirements to ensure that employees are paid at least the full applicable minimum wage for all hours worked that week.  (*See* ECF No. 145-5, ¶ 16).

Yet, despite this extensive evidentiary backdrop, none of Plaintiffs' supporting declarations evince actual knowledge of *other* servers not receiving a tip credit notice. Plaintiffs simply have not come forward with evidence, beyond pure speculation, to satisfy their modest showing of a factual nexus between them and those 40,000 other servers to whom opt-in notice would be sent if this action were conditionally certified.  *Symczyk*, 656 F.3d at 193; *see also Hall v. Guardsmark, LLC*, Civ. No. 11-213, 2012 WL 3580086, at *11 (W.D. Pa. Aug. 17, 2012) ("To permit the named plaintiffs to obtain conditional certification by attesting to policies applied to them and then stating that they 'believe' other employees were subjected to the same policies would in effect result in automatic preliminary certification, . . .  which is at odds with the modest factual showing standard approved of by the Court of Appeals in *Symczyk*") (internal citation omitted).

Plaintiffs argue that Bob Evans bears the ultimate burden of proving that its restaurants satisfy the tip credit notification requirements, that Bob Evans lacks documentary evidence of tip credit notice for a substantial percentage of its 40,000 servers, and that it is impossible for Plaintiffs to "prove a negative 40,000 times over."  (*See* ECF No. 151 at 4, 9-11).   While Plaintiffs may be correct that Bob Evans bears the burden of establishing entitlement to take the tip credit against its servers' wages, *Reich*, 28 F.3d at 403, Plaintiffs are not correct in arguing that Bob Evans' burden

of proof on the merits of that issue somehow obviates Plaintiffs' burden for establishing conditional certification here.[13]

At this conditional certification stage, Plaintiffs do not have to proffer declarations from 40,000 servers averring that they did not receive tip credit notice, but Plaintiffs do bear the burden of making "a modest factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Hall*, 2012 WL 3580086, at *6 (quoting *Myers*, 624 F.3d at 555) (internal quotation marks omitted).   Thus far, Plaintiffs have only made factual showings about themselves. They have offered nothing more than speculation about others, at least regarding their tip credit notice claim.   Accordingly, their modest burden for conditional certification for this claim has not been met.

## B.  **FLSA Dual Jobs Minimum Wage Claims** (Counts II and III)

Plaintiffs' FLSA minimum wage claim at Count II seeks recovery of unpaid wages for non-tipped duties *unrelated* to their tipped occupation, such as sweeping, mopping, preparing dessert, and baking bread.  (*See* ECF No. 130, ¶¶ 10, 230).  Plaintiffs' FLSA minimum wage claim at Count III seeks recovery of unpaid wages for spending more than 20% of their workweek performing non-tipped duties that were *related* to their tipped occupation, such as setting and bussing tables, brewing coffee, and rolling silverware.  (*See id.*, ¶¶ 10, 231).  Both of these claims derive from the so-called "Dual Jobs Regulation."  *See* 29 C.F.R. § 531.56(e) and (f).

---

[13]     Plaintiffs now seemingly argue, for the first time in their Reply and in their Supplemental Memorandum in Support of Motion for Conditional Certification (ECF Nos. 151 at 2; 169), that Bob Evans' tip credit notice is facially defective, even though Plaintiffs' Complaint and Motion for Conditional Certification seek to pursue collective claims based upon Bob Evans' alleged *failure to supply* tip credit notification to its servers.  Whether some or all named Plaintiffs succeed on the merits of their tip notice claim, as pled or as possibly re-framed, is of no moment at this juncture because a full evaluation of the merits is not appropriate at this stage.

The Dual Jobs Regulation proscribe employers from paying subminimum wage for the untipped work of an employee performing "dual jobs," where one job receives tips in addition to salary and the other does not.  An employer can only take a tip credit for the hours that the employee works in the tipped occupation. The Dual Jobs Regulation provides the example of a hotel maintenance person also working as a waiter who may only receive tip credit for the hours worked as a waiter and must be paid the full minimum wage for hours worked in maintenance. *See* 29 C.F.R. 531.56(e). By contrast, a waiter or waitress who performs other work that directly supports the tip-producing work, sometimes referred to as "side work," such as cleaning and setting tables, toasting bread, making coffee, and occasionally washing dishes or glasses, may be paid a subminimum wage supplemented by tips for all hours worked so long as those untipped duties are related to the tipped work and occur only occasionally, that is, no more than 20% of their work time.[14]  *See* 29 C.F.R. 531.56(f).

In support of their Motion for Conditional Certification concerning these FLSA dual job minimum wage claims, Plaintiffs point to Bob Evans' company-wide server job descriptions, (*see* ECF Nos. 141-7; 145-1), its company-wide "Server Outs" checklist, (*see* ECF No. 141-9), Server Cleaning Lists, (*see* ECF No. 141-10),  and Sidework Binder, (*see* ECF No. 141-11), along with several supporting declarations.  According to these declarations, servers were always paid less than the minimum wage yet performed non-tipped work such as opening duties prior to serving their first table, closing duties after serving their last table and after the restaurant is closed to

---

[14]      As previously addressed by the Court, "the line becomes blurred where non-tipped duties that are 'related' to the tipped occupation, like the occasional washing of dishes, take up an inordinate amount of time . . . The line is also blurrier where an employee performs work that is so unrelated to their job that they are essentially a 'dual jobs' employee, like the maintenance man and waiter."  (*See* ECF No. 155 at 16).  Although the parties have disputed the validity of the 20% rule, the Court previously determined that Plaintiffs stated cognizable claims thereunder and further held that even assuming the invalidity of this 20% rule, Plaintiffs still stated a claim on whether their non-tipped, related duties were not "contemporaneous" or took up an unreasonable amount of time before or after their tipped duties.  (*See id.* at 21).

customers, and ongoing duties between serving customers.  (*See* ECF Nos. 141-1, ¶¶ 8-14; 141-2, ¶¶ 7-13; 141-3, ¶¶ 6-16; 141-4, ¶¶ 5-16; 141-5, ¶¶ 4, 8-17; 141-6, ¶¶ 4, 8-15).  The declarations delineate a litany of related and unrelated tasks[15] that servers spend approximately 40-60 percent of their workweek performing, (*see* ECF Nos. 141-1, ¶ 10; 141-2, ¶ 9; 141-3, ¶ 9; 141-4, ¶ 11; 141-5, ¶ 10; 141-6, ¶ 10), without the opportunity for earning tips.

The record also demonstrates that servers perform their work, including side work, at the direction of General Managers, Assistant General Managers, and one or two Assistant Managers at each restaurant.  The General Manager at each restaurant location reports to a Director of Operations for a particular geographic area. The Directors of Operations report to Regional Vice Presidents, who report to the Chief Operating Officer.  (*See* ECF No. 145-1, ¶¶ 3, 6-7).  Bob Evans' corporate office and operations team "cascades" information and directives through this managerial chain of command downward to the servers and other restaurant employees.  (*See id.*, ¶¶ 30-32).

Directives for performing side work are cascaded downward from corporate executives to servers at each restaurant.  For instance, BEF, LLC developed side work binders for its Bob Evans-branded restaurants in 2016.  The side work binder and related Standard Operating Procedure were provided to restaurant employees in August 2016.  (*See* ECF No. 145-1, ¶ 21 and Exs. 4, 7).  BEF LLC took substantial steps to ensure that the side work binder was being used as directed through frequent communications to managers and servers, and through training.  (*See id.*, ¶¶ 21-23).  Then,

---

[15]      These tasks include collecting trash, scrubbing walls and doors, cleaning windows and window sills, cleaning light fixtures, sweeping and mopping floors, breaking down and cleaning booths, washing dishes and operating the dish tank, stocking and setting tables, bussing tables, preparing on-line orders, preparing carry-out orders, and preparing delivery orders, answering the phone and working the cash register, stocking and cleaning the salad case, stocking and cleaning the steam table, preparing salads, preparing desserts, baking bread, plating and preparing other foods away from customer tables, brewing coffee, cleaning beverage machines, preparing specialty drinks, filing and restocking ice bins, preparing individual servings of butters and dressings, rolling silverware.  (*See* ECF Nos. 141-1, ¶ 14; 141-2, ¶ 13; 141-3, ¶ 16; 141-4, ¶ 16; 141-5, ¶ 17; 141-6, ¶ 15).

after BER acquired BEF LLC's Bob Evans-branded restaurants in April 2017, BER issued its own side work binders in 2017, 2018, and 2019, (*see id.*, ¶ 26 and Exs. 9, 10, 21), and continued to provide company-wide direction concerning side work to servers at each restaurant.  (*See id.*, ¶¶ 26, 27, 30-40).

This evidence clearly establishes that Bob Evans centrally developed policies and practices to determine the job tasks to be performed by servers and then implemented those policies and practices through a cascading company-wide chain of command. Bob Evans contends that these centrally determined policies and practices were "designed to have our servers directly serving the guest 80% of the time so the guest receives the very best service." (ECF No. 145-1, ¶¶ 18, 22 and Ex. 4).  Indeed, Bob Evans characterizes its efforts to minimize non-tipped work as being focused on providing "exceptional hospitality and customer service, rather than side work." (*See id.*, ¶ 19). Bob Evans further asserts that these ongoing company-wide efforts "led to widespread compliance," and it touts data from May 2019 through October 2020 evincing that servers certified spending less than 20% of their time on non-tip generating duties in 95% of 1,699,963 daily shifts worked after instituting a point-of-sale certification procedure for servers beginning on April 25, 2019.  (*See* ECF Nos. 145 at 34; 145-1, ¶¶ 6, 42; *see also* ECF No. 170 at 12).

The Court notes, however, that Bob Evans' purported compliance outcomes pertain to a more recent four-month period and does not cover portions of the relevant period prior to implementing various side work-related policy directives.  (*Compare, e.g.*, ECF No. 141-1, ¶¶ 3, 10 (ECF No. 141-1) ("routinely perform[ing] non-tipped work while making less than minimum wage such as . . . rolling trays full of silverware" prior to February 2018), *with* ECF No. 145-1, ¶¶ 39-41 (communicating new policy on December 7, 2018 of not permitting servers to roll silverware while serving guests and closed into the server tipped minimum wage job code).

Moreover, Plaintiffs generally challenge the efficacy and veracity of Bob Evans' company-wide efforts as outlined above by proffering several declarations averring that servers performed substantial amounts of non-tipped work well beyond 20% of their work time.  Plaintiffs also point to notes from a call with Bob Evans' Regional Vice Presidents on August 5, 2016, reflecting "talking points" for cascading communications down to the servers stating, in part: "[w]e want our servers to be directly serving the guest 80% of the time so the guest receives the very best service! We do not want to discuss the 80/20 rule but reinforce hospitality." (ECF No. 151-1).  Plaintiffs infer from this documentary evidence that Bob Evans' goal was to "hug the line between 80% tipped labor and 20% non-tipped labor" and that it "did not want anyone on the ground level actually assessing whether servers where spending more than 20% of their time on non-tipped labor."  (*See* ECF No. 151 at 5-7).

Based upon the foregoing, and without weighing the evidence or resolving factual disputes at this juncture, the Court finds that Plaintiffs have proffered enough evidence, beyond pure speculation, to satisfy their modest burden of showing that they and potential opt-in plaintiffs "together were victims of Bob Evans' company-wide side work policies and practices that resulted in compensation below the minimum wage in violation of the FLSA."  *See, e.g.*, *Fiumano v. Metro Diner Mgmt. LLC, et al.,* Civ. No. 17-465, 2018 WL 1726574, at *4 (E.D. Pa. Apr. 10, 2018); *Hart v. Barbeque Integrated, Inc.*, 299 F. Supp. 3d 762, 770-71 (D.S.C. 2017); *Nelson v. Firebirds of Overland Park, LLC*, No. 17-2337, 2018 WL 3023195, at *5 (D. Kan. June 18, 2018) ("[W]hile defendants may ultimately prevail on their argument that servers simply do not spend more than 20 percent of their time performing non-tip-producing activities, that argument does not preclude conditional certification and constitutes a factual dispute better suited to further analysis at the second stage of certification.").  To be sure, the evidentiary record, such as it currently exists,

suggests that Bob Evans' company-wide policies and practices were periodically modified over time and became increasingly effective at limiting the amount of non-tipped work performed by servers, thereby casting doubt on whether Plaintiffs will be able to satisfy their heavier burden at the more stringent final certification stage establishing that Plaintiffs and *all* targeted putative opt-in plaintiffs are, in fact, similarly situated for the *entire* period presumptively at issue. *Zavala*, 691 F.3d at 537 (imposing a "preponderance of the evidence" burden of proof on plaintiffs at the second stage). But, at this provisional certification stage, Plaintiffs have done enough for the dissemination of court-approved notice to potential collective action members for these claims.

### C. <u>FLSA Overtime Claim</u> (Count IV)

Two named Plaintiffs, McKeel and Caperna, allege on behalf of themselves and a collective "OT Class" that Bob Evans violated 29 U.S.C. §§ 206 and 207 by failing to pay them proper overtime compensation for weeks when they worked more than forty (40) hours. (*See* ECF Nos. 130, ¶¶ 11, 60-69, 207-218, 280-291; 130-1; 130-2). These two Plaintiffs contend that Bob Evans mis-calculated their hourly pay rates for overtime compensation purposes by using a subminimum wage rate rather than, as applicable: (i) the full, applicable minimum wage less up to the maximum allowable tip credit, pursuant to 29 C.F.R. § 531.60; and (ii) the weighted average of such hourly rates when working two or more different types of work (tipped and untipped) in a single workweek, pursuant to 29 C.F.R. § 778.115. (*See* ECF No. 141 at 10; *see also* ECF No. 148 at 33-34).

In support of their motion to conditionally certify a collective for this overtime claim, McKeel and Caperna each proffer a declaration accompanied by one pay stub for one pay period purporting to reflect being paid overtime at an incorrect rate. (*See* ECF Nos. 130-1; 130-2; 141-12, ¶ 10 and Ex. 1 (for pay period ending May 23, 2018); 141-14, ¶ 18 and Ex. 1 (for pay period

ending November 29, 2017)).  In response, Bob Evans asserts that certification should be denied because these two Plaintiffs aver uniquely individual claims, yet they seek to represent approximately 40,000 other servers despite thirteen other named Plaintiffs in this case who are not alleging a like-type overtime claim,[16] at least eight of whom worked overtime hours during their employment.  (*See* ECF No. 145-5, ¶ 10 and Ex. 3).  Bob Evans also contends that Plaintiffs do not identify an unlawful overtime compensation policy or practice applicable to both of them and other servers to justify conditionally certifying a company-wide collective action for overtime claimants, and that proceeding collectively here ought to be foreclosed because the instant overtime claims "relate[] to specific circumstances personal to [McKeel and Caperna] rather than any generally applicable policy or practice."  (*See* ECF No. 145 at 14) (quoting *Bramble v. Wal-Mart Stores, Inc.*, Civ. No. 09-4932, 2011 WL 1389510, at *4 (E.D. Pa. Apr. 12, 2011) (denying conditional certification of employees allegedly misclassified as exempt from overtime pay entitlement because such claims would require an individualized inquiry into each claimant's job tasks)).

In reply, Plaintiffs point to evidence proffered by Bob Evans showing that it uses the same payroll service provider, Automatic Data Processing, Inc. ("ADP"), for all servers and that ADP always calculates overtime for all of Bob Evans' servers according to its company-wide "Overtime for Tipped Employees" policy.  (*See* ECF Nos. 145-5, ¶¶ 9, 17-18 and Ex. 5; 145-2, ¶ 7 and Ex. 1 at 17; 145-3, ¶ 7 and Ex. 1 at 15, Ex. 2 at 14).  However, even when viewed in conjunction with

---

[16]     Bob Evans also contends that certification should be denied because it correctly calculated the overtime compensation rate for McKeel and overpaid Caperna.  (*See* ECF No. 139 at 58-61).  The Court previously considered Bob Evans' arguments on this issue but denied its motion to dismiss such claims, holding that all well-pleaded factual allegations must be accepted as true at the motion to dismiss stage.  (*See* ECF No. 155 at 33).  Here, as stated *supra*, the Court does not weigh the evidence, resolve factual disputes, or reach the merits; rather, the Court must simply discern whether Plaintiffs have made a modest factual showing that they are similarly situated with other putative members of the collective in respect to their overtime claim.

this overtime policy and its use of ADP to process its payroll for all servers company-wide, there is nothing presently in the evidentiary record evincing the illegality of this policy and nothing beyond one pay stub each for McKeel and Caperna.  Plaintiffs simply fail to meet their modest burden of establishing, beyond pure speculation, that potentially upwards of 40,000 other servers were improperly paid for overtime in a way similar to that of McKeel and Caperna. Once again, these Plaintiffs have made factual showings only about themselves and have offered nothing more than speculation about others, at least as to their overtime claims.  Accordingly, their modest burden for conditional certification for their overtime claims has not been met.[17]

### D.  Equitable Tolling for Potential Opt-In Plaintiffs

Actions under the FLSA must be commenced within two years of the alleged violation, or within three years thereof if the violation is willful.  29 U.S.C. § 255(a). An action is commenced for a named plaintiff on the date when the complaint is filed.  *Id.*, § 256(a).  For those who subsequently opt-in, however, the action is not commenced until the date on which their written consent is filed.  *Id.*, § 256(b).  However, written consents properly filed by opt-in plaintiffs do not

---

[17]     Notwithstanding this dearth of evidence supporting conditional certification at this time, Plaintiffs seemingly reframe their overtime claims in their reply brief to suggest that these claims are "interrelated" with their tip credit notice and non-tipped work claims.  (*See* ECF No. 151 at 16). As Plaintiffs explain: "If [Bob Evans] were not entitled to claim a tip credit altogether because [it] did not properly notify [its] servers of the tip credit, then [it was] not entitled to take a tip credit on the overtime premiums owed to Plaintiffs and [it is] liable for unpaid overtime. Likewise, if [Bob Evans was] not entitled to claim a tip credit at times when [its] servers were engaged in dual jobs, and those same servers worked in excess of 40 hours in a given workweek, then [Bob Evans was] not entitled to claim a tip credit against at least some of those overtime hours."  (*Id.*; *see also* ECF No. 169 at 9-11).  Bob Evans points out that Plaintiffs have not pled nor previously argued that their overtime claim was derivative of other claims, and that they would not have limited themselves to asserting such claims only on behalf of McKeel and Caperna had they intended to plead these claims derivatively.  (*See* ECF No. 170 at 9-11).  Indeed, "[i]t is one thing to set forth theories in a brief," but "it is quite another to make proper allegations in a complaint."  *Com. of Pa. ex rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988); *see also Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").  The Court agrees that this newly articulated derivative theory of recovery more aptly encompasses a category of additional damages flowing to those Plaintiffs, if any, who ultimately prevail on their tip credit notice and "dual job" non-tipped work claims. Those putative opt-in plaintiffs are already included among the dual jobs collective action being conditionally certified at Counts II and III.

relate back to the filing date of the named plaintiffs' complaint. *See Woodard v. Fedex Freight East, Inc.*, 250 F.R.D. 178, 193 (M.D. Pa. 2008). Therefore, in the absence of equitable tolling, prospective opt-in plaintiffs' potential recovery will be limited to the two- or three-year period preceding the filing of their respective written consents. *Id.*

While the instant action has already been "commenced" as to the named Plaintiffs and those opt-in Plaintiffs who have already filed their written consents, the statute of limitations continues to run for potential opt-in plaintiffs until they file their own written opt-in consents. Consequently, Plaintiffs' request that the statute of limitations for their tip credit notice and overtime claims at Counts I and IV,[18] respectively, be equitably tolled for all potential opt-in plaintiffs as of the date Plaintiffs filed their initial briefing on their renewed Motion for Conditional Certification (ECF No. 141), that is, January 3, 2020; alternatively, Plaintiffs seek to toll the limitations period from the date such briefing was complete, that is, November 16, 2020. (*See* ECF Nos. 169; 170; 172; 186 at 9-10).[19]

The Third Circuit Court of Appeals has identified the following "three principal situations in which equitable tolling is appropriate": (1) if the defendant has actively misled a plaintiff respecting that plaintiff's cause of action, and that deception causes non-compliance with an applicable limitations provision; (2) if the plaintiffs have in some extraordinary way been prevented from asserting their rights; or (3) if the plaintiffs have timely asserted their rights mistakenly in the wrong forum. *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 591 (3d Cir. 2005); *see also Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 845 (3d Cir. 1992). However,

---

[18]     The parties previously entered a stipulation tolling the statute of limitations as of October 1, 2019, for their dual jobs claims referred to therein as "related and unrelated non-tipped labor claims" currently pending at Counts II and III of the Complaint. (*See* ECF No. 108). The Court approved this stipulation on July 30, 2019. (ECF No. 112).

[19]     The parties also filed supplemental authorities with the Court. (ECF Nos. 173, 174, 175, 178, 184).

"[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not as a cure-all for an entirely common state of affairs."  *Wallace v. Kato*, 549 U.S. 384, 396 (2007).  Moreover, plaintiffs will not receive the benefit of equitable tolling unless due diligence is exercised in pursing and preserving their claims.  *Santos ex rel. Beato v. United States*, 559 F.3d 189, 197 (3d Cir. 2009) (citing *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990)).  Plaintiffs bear the burden to prove the application of such tolling.  *Courtney v. LaSalle Univ.*, 124 F.3d 499, 505 (3d Cir. 1997).

Here, Plaintiffs' renewed motion does not contend that Bob Evans actively misled or deceived potential opt-in plaintiffs from compliance with the applicable statute of limitations, nor does it contend that these potential opt-in plaintiffs timely asserted their rights mistakenly in the wrong forum.  Rather, Plaintiffs currently contend that the Court should toll the limitations period because the consolidation of these three separate cases and the repeated reassignment to a succession of at least four judicial officers[20] amidst the vicissitudes of a global pandemic has delayed the putative collective "from being notified of their rights under the FLSA and their opportunity to assert those rights."  (*See* ECF Nos. 186, 190).  In response, Bob Evans contends that Plaintiffs' request to toll the limitations period for all potential plaintiffs is tantamount to an improper advisory opinion, that Plaintiffs have not presented evidence that all potential opt-in plaintiffs diligently pursued their rights, that Plaintiffs have not shown extraordinary circumstances to warrant tolling, and that it would be prejudiced by equitable tolling.  (*See* ECF No. 188).

---

[20]     Judge Cercone was initially assigned this case, and then it was reassigned to Judge Schwab and then to Chief Judge Hornak before being reassigned, yet again, to this member of the Court.

Plaintiffs' motion for equitable tolling will be denied at this juncture. Although the time that elapsed while Plaintiffs' renewed Motion for Conditional Certification has been pending is less than ideal, such delay was not intentionally caused by Bob Evans and is not extraordinary given the breadth and complexity of these consolidated cases and the issues raised by the parties. Indeed, "Congress knew when it enacted 29 U.S.C. § 256 that time would lapse between the filing of the collective action complaint by the named plaintiff and the filing of written consents by the opt-in plaintiffs, yet it chose not to provide for tolling of the limitations period." *Woodard*, 250 F.R.D. at 194. Even so, thus far, approximately 344 additional Plaintiffs opted-into the Williams, McKeel, and Jensen lawsuits pre-conditional certification and without being provided any court-approved notice. (*See* ECF Nos. 11, 58, 59, 67, 82, 91, 114, 121). Moreover, district courts within the Third Circuit have held that equitable tolling for potential opt-in plaintiffs, based solely on delay in deciding whether to conditionally certify a collective action, is not an extraordinary circumstance that prevents potential opt-in plaintiffs from pursuing their claims. *See Alvarez v. BI Inc.*, No. 16-2705, 2018 WL 2288286, at *16 (E.D. Pa. May 17, 2018) ("Tolling the statute of limitations for all potential opt-in plaintiffs, based only on delay in issuing a court-approved notice of the collective action, which will occur in every collective action, alters the statutory scheme and would be inconsistent with the directives of the Third Circuit and the Supreme Court that equitable tolling be applied sparingly and only in rare cases."); *see also Tompkins v. Farmers Ins. Exch.*, No. 5:14-cv-3737, 2015 WL 4931605, at *7 (E.D. Pa. Aug. 18, 2015); *Vargas v. Gen. Nutrition Ctrs., Inc.*, No. 2:10-cv-867, 2012 WL 5336166, at *7-9 (W.D. Pa. Oct. 26, 2012); *Titchenell v. Apria Healthcare Inc.*, Civ. No. 11-563, 2012 WL 3731341, at *7 (E.D. Pa. Aug. 29, 2012). This is particularly true here, where there has been no showing that potential opt-in plaintiffs were thwarted from pursuing and preserving their claims despite exercising due diligence to do so, *see*

*Santos*, 559 F.3d at 197,[21] especially when they are not (yet) entitled to court-approved notice of their right to opt-in to this action because Plaintiffs have not met their modest burden of showing that they and the potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law" regarding their tip credit notice and overtime claims. *Hall*, 2012 WL 3580086, at *6; *see also Halle*, 842 F.3d at 224.

Accordingly, at this juncture, Plaintiffs have not met their burden of demonstrating that equitable tolling for all potential opt-in plaintiffs is appropriate. However, the denial of Plaintiffs' blanket request to toll the statute of limitations is without prejudice to any individual opt-in plaintiff seeking equitable tolling based on that individual's circumstances. *See e.g.*, *Alvarez*, 2018 WL 2288286, at *17; *Titchenell*, 2012 WL 3731341, at *8.

### E.   <u>Notice to Potential Opt-In Plaintiffs</u>

District courts have discretion in the implementation of notice to putative opt-in plaintiffs because it is the Court's "managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Vargas*, 2012 WL 5336166, at *12 (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170-71 (1989)).  In exercising this discretion, the United States Supreme Court instructs that "courts must be scrupulous to respect judicial neutrality. To that end, trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action." *Hoffmann-La Roche*, 493 U.S. at 174.

Here, Plaintiffs seek approval of their proposed notice by mail and by posting "in a conspicuous area of the back-of-house of each Bob Evans restaurant location."  (*See* ECF Nos.

---

[21]     The exercise of reasonable diligence is a subjective determination based on the facts and circumstances of each individual case and the Court's equity powers must be exercised on a case-by-case basis. *Massey v. Superintendent Coal Twp. SCI*, No. 19-2808, 2021 WL 2910930, at *3 (3d Cir. 2021) (citing *Ross v. Varano*, 712 F.3d 784, 799 (3d Cir. 2013)).

141 at 14; 141-19).   Plaintiffs also request that potential collective action members be given sixty (60) days to opt-in, and that Plaintiffs be permitted to send a reminder notice thirty (30) days into the opt-in period.  (*See* ECF No. 141 at 13).   Bob Evans objects to the proposed notice without first having an opportunity to meet and confer about its content and form; it objects to workplace posting as unnecessary and duplicative; it objects to a reminder notice as unjustified and unnecessary; and it objects to the proposed sixty (60) day opt-in period as overbroad.  (*See* ECF No. 145 at 34-35).   Upon review of the parties' respective arguments, the Court makes the following determinations.

First, the parties shall meet and confer about the content, form, and process of notice to be approved by this Court. Doing so is reasonable and "[c]onsistent with the process frequently followed by other judges of this Court." *Kolasa v. Bos Solutions, Inc.*, Civ. No. 17-1087, 2018 WL 3370675, at *7 (W.D. Pa. May 10, 2018); *Kuznyetsov,* 2009 WL 1515175, at *6.  If the parties cannot agree upon the content, form, and process, they will be directed to cross-file proposed notices and procedures, along with pertinent supporting argument.

Second, Plaintiffs have not provided any supportable basis, at this juncture, to justify the need for the posting of notices in each Bob Evans-branded restaurant. Such postings at approximately 480 separate locations would only be accessible to Bob Evans' current employees for whom Bob Evans presumably has valid and current mailing addresses and thus doing so would be duplicative of such mailings while totally ineffective for many former employees.  Plaintiffs presently offer no substantiated rationale for why mailing notices would be inadequate. *See Kuznyetsov,* 2009 WL 1515175 at *6*; Vargas*, 2012 WL 5336166, at *13.  Likewise, Plaintiffs have offered no substantiated basis at this time as to why reminder notices would be necessary. Accordingly, these requests are denied without prejudice subject to re-visiting the possible need

for alternative delivery methods as well as reminder notices based upon a substantiated and particularized basis and scope for doing so.

Lastly, the Court finds Plaintiffs' proposed sixty (60) day opt-in period to be reasonable. *See Kuznyetsov,* 2009 WL 1515175, at *6.

III.     <u>**CONCLUSION**</u>

For the reasons stated in this Memorandum Opinion, Plaintiffs' renewed Motion for Conditional Certification, Approval of Proposed Notice Procedure, and Equitable Tolling (ECF Nos. 141, 169) and Motion for Equitable Tolling (ECF No. 185) are granted in part and denied in part.

An appropriate Order will follow.

<u>*s/ W. Scott Hardy*</u>
W. Scott Hardy
United States District Judge

Date:   April 14, 2022

cc/ecf:  All Counsel of Record